FILED 11 JUN 7 10:19 USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

WANETA COLE,

Civ. No. 10-510-CL

                    Plaintiff,

**REPORT & RECOMMENDATION**

v.

MICHAEL ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

                    Defendant.

———————————————————

CLARKE, Magistrate Judge.

Plaintiff Waneta Cole brings this action pursuant to Section 205(g) of the Social Security

Act, as amended ("the Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the

Commissioner's final decision denying plaintiff's application for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and XVI,

respectively, of the Act. For the reasons set forth below, the decision of the Commissioner

should be affirmed.

## PROCEDURAL POSTURE

Plaintiff filed an application for DIB benefits on May 15, 2007, alleging disability

beginning July 11, 2006. (Tr. 134, 138, 156-157). Her claims were denied in initial

determinations dated June 14, 2007, and plaintiff did not request reconsideration. (Id.). Plaintiff

subsequently filed concurrent applications for DIB and SSI benefits on September 11, 2007,

alleging disability beginning August 31, 2007, (Tr. 121-131), due to bipolar disorder and anxiety,

(Tr. 156-165), and problems with her right knee, (Tr. 208). Her claims were denied initially on

October 29, 2007, (Tr. 81-90), and again upon reconsideration on April 9, 2008, (Tr. 93-99). A

hearing on plaintiff's applications was held before an Administrative Law Judge ("ALJ") on

October 26, 2009. (Tr. 24-74). Plaintiff, represented by counsel, appeared and testified, as did

lay witnesses Tonna Clark, Jaquonna Hareaway, and Michael Cole, and a vocational expert

("VE"). On November 5, 2009, the ALJ rendered an adverse decision. (Tr. 10-19). On

November 19, 2009, plaintiff requested the Appeals Council review the ALJ's decision. (Tr. 5-

6). On April 16, 2010, the Appeals Council denied plaintiff's request for review. (Tr. 1-4).

## BACKGROUND

Plaintiff was born December 24, 1966. (Tr. 156). At the time of the hearing and the

ALJ's decision, she was 40 years old. (Tr. 17). Plaintiff reports she suffered emotional abuse

and neglect as a child, and was the victim of sexual assault and physical violence as a teenager.

(Tr. 30, 174, 265, 286, 289). Plaintiff admits to long-term marijuana abuse, starting at age 12

and continuing through 2005. (See Tr. 265, 285, 287). Plaintiff maintains a close relationship

with her husband, daughter and mother, however, plaintiff's father and siblings live in Texas,

and the record is silent on the extent of her relationship with them. (Tr. 291). Plaintiff left home

at the age of 16. (Tr. 265).

Plaintiff dropped out of high school after the tenth grade, and later obtained a general

equivalency degree (GED) as well as a certificate in Automated Office Technology from

Portland Community College. (Tr. 186). She has past relevant work experience as a caregiver,

customer service representative, file clerk, grocery checker, janitor, parts picker, bill collector, and office clerk. (Tr. 17).

There is a history of mental disorders in plaintiff's family: her mother suffers from obsessive compulsive disorder ("OCD"), her father suffers from paranoid personality disorder, and her maternal grandmother had manic episodes and psychosis. (Tr. 47, 265). At the hearing before the ALJ, plaintiff testified that she was diagnosed with bipolar disorder, social phobia, panic attacks, and anxiety at the age of 27. (Tr. 28).[1] Plaintiff further testified that she experiences severe panic attacks three to four times per week, daily anger outbursts, vertigo, racing thoughts, depression, and suicidal ideation, and has experienced auditory hallucinations. (Tr. 28-36). She also testified that she suffers from knee pain but did not know the medical term for her condition; Tonna Clark, plaintiff's mother, testified that plaintiff has a "bump" on her right knee due to calcium deposits and possibly arthritis. (Tr. 38, 48). Finally, plaintiff testified that her hands shake "uncontrollably," which she believes is a side effect of her medications; her daughter, Jaquonna Hareaway, and husband, Michael Cole, testified that plaintiff's hands are "get shaky" and that she frequently drops things. (Tr. 39, 57, 61-62). Plaintiff alleges disability beginning August 31, 2007, due to bipolar disorder, severe anxiety, right knee arthrosis, and hand problems. (Pl.'s Opening Br., pp. 4).

### The Medical Record

The earliest medical records included in the record in this case are from Kaiser Permanente. (Tr. 260-284). On March 9, 2005, Christine C. Arthur, Medical Doctor ("M.D."), saw plaintiff for complaints of insomnia leading to irritability. (Tr. 264). Plaintiff reported continued irritability and reduced concentration, periods of high energy and drive, reduced sleep,

---

[1] Plaintiff's Opening Brief erroneously reports that plaintiff testified that she was diagnosed at age 17. (Pl.'s Opening Br., pp. 4).

racing thoughts, pacing, and "feeling spaced out." (Tr. 264-265). Dr. Arthur diagnosed plaintiff

with an unspecified mood disorder,[2] noting plaintiff "ha[d] not been on an official mood

stabilizer for years, but had used marihuana [sic] til 3 weeks ago to calm down and relax." (Tr.

264). Dr. Arthur noted that on March 4, 2005, plaintiff was seen in emergency care ("EC") for

complaints of insomnia and being in a self-described "manic phase," and referenced an

"assessment" of plaintiff's "present illness and psychosocial issues" dated March 4, 2005,

completed by Kate Soyars. (Id.). However, Ms. Soyars' medical credentials are not identified

and her assessment is not included in the record. Dr. Arthur also noted plaintiff "did not describe

the problems" she reported on March 4 in a February 17, 2005, visit with her primary care

physician ("PCP"), but rather described only occasional sleep problems due to working rotating

shifts and occasional anxiety precipitated by fatigue. (Tr. 265).

Under "Past Psychiatric History," Dr. Arthur noted that plaintiff had received outpatient

mental health care and "[t]ook Lithium for 8 months in 1990 or so. Nothing since." (Id.). Dr.

Arthur noted that plaintiff's sleep patterns were normal on Zyprexa and that Oxazepam was

effective for treating plaintiff's anxiety. (Id.). Plaintiff reported she was not experiencing

depression, tearfulness, elation, panic attacks, memory problems, obsessions or phobias. (Id.).

Dr. Arthur's DSM IV Diagnosis notes "Bipolar II, current episode mixed, moderate" under Axis

I; "Obsessive Compulsive P D" under Axis II; "allergies" under Axis III; "moderate,"

unexplained, under Axis IV; and under Axis V noted a current GAF[3] score of 60 with a "best"

---

[2] Dr. Arthur's exact diagnosis was "Mood Disorder NOS [296.90A]," defined as "including
disorders with mood symptoms that do not meet the criteria for any specific Mood Disorder and
in which it is difficult to choose between Depressive Disorder Not Otherwise Specified and
Bipolar Disorder Not Otherwise Specified (e.g., acute agitation)." American Psychiatric Ass'n.,
DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 410 (4th ed., text rev., 2000)
("DSM-IV-TR").

GAF score of 65 in the past. (Tr. 265). Dr. Arthur found that therapy was not required, continued plaintiff's Zyprexa prescription, offered plaintiff Lamictal, and recommended a medication only treatment plan. (Tr. 266).

Dr. Arthur next saw plaintiff on July 11, 2005. (Tr. 263). Plaintiff reported being depressed, initially representing that the depression happened "out of the blue," but later admitted that she had a new job as a bill collector which she hated, that her son was in legal trouble, and that she had not taken her medication for the past five days. (Id.). Dr. Arthur noted plaintiff "inquired re getting on SSD, as she has had problems keeping jobs due to mood fluctuations." (Id.). Dr. Arthur noted the mental status exam ("MSE") was "congruent with moderate depression," noted "[n]o psychosis," and recommended plaintiff find a less stressful job and continue her medications. (Id.).

On September 21, 2005, Dr. Arthur renewed plaintiff's Zyprexa prescription in response to plaintiff's report that she was "hearing voices." (Tr. 262).

On October 16, 2006, plaintiff again reported she was hearing voices, telling her to "do things like hit her bosses [sic] car or drown herself in a pool." (Tr. 261-262, 276-279). Dr.

---

[3] The Global Assessment of Functioning (GAF) Scale may be used to report an individual's overall functioning on Axis V of the diagnosis. American Psychiatric Ass'n., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., text rev., 2000). It considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations." Id. at 34. The first description in the range indicates symptom severity; the second indicates level of functioning. Id. at 32. In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings. Id. at 33.

GAF 60 is at the highpoint of the range GAF 51-60, which indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attack) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 34. GAF 65 is at the midpoint of the range GAF 61-70, which indicates "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

Arthur saw plaintiff for the last time on October 25, 2006, at which time plaintiff reported Zyprexa successfully treated her auditory hallucinations, but reported feeling depressed and having problems sleeping. (Tr. 261, 272). Dr. Arthur prescribed clonazepam for sleep and Zoloft for depression. (Tr. 272).

Plaintiff lost her Kaiser insurance in or around June of 2007, and was thereafter seen at Cascadia Behavioral Healthcare ("Cascadia"). (Tr. 291). On July 5, 2007, Tim Holt, PMHNP, at Cascadia refilled plaintiff's psychiatric medication prescriptions "to avoid destabilization" prior to completing a psychiatric assessment of plaintiff, noting that plaintiff denied any side effects resulting from her medication, including the absence of extrapyramidal symptoms ("EPS"). (Tr. 309).

On July 25, 2007, PMHNP Holt conducted a Psychiatric Assessment of plaintiff. (Tr. 286-290). Plaintiff reported the following complaints: auditory hallucinations, suicidal ideation with a plan, psychomotor agitation, insomnia secondary to ruminating thoughts and fractured sleeping pattern, engaging in non-purposeful movements, being emotionally labile, having a depressed or irritable/agitated mood, lack of energy, severe to panic anxiety while in social or public settings, and episodes of hypomania vs. mania. (Tr. 286). However, upon further questioning plaintiff denied current preoccupation with suicidal ideation either with or without a plan, and stated she had not experienced a hypomanic vs. manic mood for approximately one year, which PMHNP Holt noted coincided with the date she was prescribed Zyprexa, "an atypical antipsychotic." (Id.). Holt noted that while plaintiff stated she had been evaluated by "multiple psychiatrists," she was unable to provide a clear history of the progression of her symptoms and stated only that she remembered a consistent diagnosis of bipolar disorder and prior prescriptions for Lithium, Prozac, and Zoloft. (Id.).

Holt concluded that plaintiff had "an unclear history" related to a primary diagnosis of bipolar disorder, noting that plaintiff "failed to provide an in-depth enough history to substantiate such a diagnosis, and instead, provided a lengthy list of symptoms that could pertain to multiple diagnoses." (Tr. 288). He also concluded that plaintiff's chronic marijuana use had an "uncertain" effect on the symptoms she complained of, noting that plaintiff reported she had used marijuana to help her sleep for "approximately 15 years" and had last used marijuana one month ago. (Tr. 287-288). Accordingly, Holt's "initial DSM IV diagnostic impression" noted mood disorder NOS; R/O bipolar I disorder; R/O bipolar II disorder; anxiety disorder NOS; R/O social phobia; cannabis abuse, early full remission; R/O cannabis-induced psychotic disorder with hallucinations; and R/O cannabis-induced anxiety disorder, with a current GAF of 58. (Id.). Holt discontinued plaintiff's Zyprexa prescription, continued her Clonazepam prescription, and added a prescription for Depakote. (Tr. 288).

Holt's psychiatric assessment includes several references to an "impending Behavioral Health Assessment."[4] (Id.). On July 25, 2007, Kirsten Peterson, Qualified Mental Health Professional ("QMHP"), conducted a Behavioral Health Assessment of plaintiff. (Tr. 291-298). QMHP Peterson noted that plaintiff had lost her medication coverage as well as counseling at the time she lost her Kaiser insurance, and presented with complaints of disrupted sleep, racing thoughts, pacing, auditory hallucinations urging her to kill herself, poor motivation, not caring, and anxiety when in crowds or traffic. (Tr. 291, 294). Plaintiff denied current suicidal ideation or a history of suicide attempts. (Id.). Peterson noted plaintiff had no history of psychiatric hospitalization and that her mental health treatment consisted of one year of medication-only

---

[4] PMHNP Holt's psychiatric assessment also includes several references to "the written psychiatric assessment." (Tr. 286-287). This document is not described by date or author in a manner that allows identification. No psychiatric assessment either contemporaneous to or pre-dating PMHNP Holt's psychiatric assessment is found in the record.

treatment through Kaiser, with current prescriptions for Depakote and Klonopin and a past prescription for Zyprexa. (Tr. 292). Plaintiff denied alcohol use but admitted to daily use of marijuana for 15 years to cope with depression, but stated she stopped smoking four years ago. (Id.). Plaintiff denied having any medical issues. (Id.). Peterson found plaintiff to be a "vague historian," (Tr. 294), and noted her suspicion that plaintiff might be exaggerating her symptoms and/or abusing clonazepam due to plaintiff's sedated appearance and stated goal of wanting to quit her job and apply for SSI. (Tr. 295). Peterson recorded a diagnostic impression of "Bipolar I D/O most recent episode depressed, moderate," a GAF score of 51, and recommended a treatment plan consisting of individual and group therapy, medication evaluation/management, and case management. (Id.).

PMHNP Holt next saw plaintiff on August 22, 2007. (Tr. 308). He noted that plaintiff reported sedation secondary to the Depakote, denied recent auditory hallucinations, and otherwise reported that her symptoms were generally the same except that her medications decreased her racing thoughts, allowing her to think more rationally. (Id.). Holt observed "coordinated and purposeful movements with no obvious indications of psychomotor retardation or agitation." (Id.). He found no indications of psychosis and plaintiff denied both recent suicidal ideation and psychotic distortions. (Id.). Holt assessed plaintiff as suffering from mood and anxiety disorders and cannabis abuse, early full remission. (Id.).

QMHP Peterson next saw plaintiff on August 30, 2007, at which time plaintiff reported she had quit her job, was applying for social security benefits, and requested a copy of the psychiatric assessment done by PMHNP Holt for a meeting with her lawyer. (Tr. 300). Peterson noted that plaintiff "appeared very sedated" but denied abusing Clonazepam (Klonopin), and

stated that her medications were "making her drowsy but are also helping decrease suicidal ideations, racing thoughts and pacing." (Id.).

On September 12, 2007, plaintiff called Cascadia to make appointments with PMHNP Holtz and QMHP Peterson, stating that she had reported her marijuana history incorrectly and had not smoked marijuana in four years. (Tr. 299). Plaintiff sounded sedated but denied taking too much Lorazepam, and reported that she was feeling dizzy and falling a lot but declined to come to the medication clinic until her appointment the following week. (Id.).

On September 20, 2007, PMHNP Holt noted that plaintiff appeared more alert and reported that "[t]he current complaint is limited to elevated or unmanageable levels of anxiety, which according to her description can be defined as more of a reactionary anxiety and failed to describe them in such a way to suggest having panic attacks." (Tr. 306). He further noted that plaintiff reported an inconsistency in her marijuana abuse history "which was brought about after she obtained a copy of [Holt's] assessment to provide for her lawyer, who is attempting to obtain a disability status for her." (Id). Plaintiff asserted she had not used marijuana since April of 2005 and further stated the error could have been her fault, "secondary to the sedating effects from the Depakote." (Id.). Plaintiff denied experiencing any side effects from her medications. (Id.). Holt observed no obvious indications of psychomotor retardation or agitation, and noted that plaintiff denied having and did not demonstrate suicidal or homicidal ideations or psychotic distortions such as hallucinations, delusions, phobias, and obsessions. (Tr. 306-307). Holt assessed plaintiff as suffering from mood and anxiety disorder NOS, R/O bipolar I, bipolar II disorder, and social phobia, and discontinued the Lamictal prescription, increased the Depakote dosage, and otherwise continued plaintiff's medications. (Tr. 307).

On September 25, 2007, QMHP Peterson noted that plaintiff appeared less sedated, had stopped taking Lamictal "due to developing a rash and falling down a lot," and was feeling better despite being "a little depressed." (Tr. 367). Plaintiff reported having difficulty waking up before 10 a.m., feeling anxious and being unable to drive due to anxiety, but also reported cooking dinner, cleaning her house, and going fishing with a friend. (Id.).

On October 15, 2007, QMHP Peterson noted that plaintiff reported having a two week "spell of depression" marked by crying spells and suicidal thoughts, and being involved in a car accident after running either a stop sign or a stop light. (Tr. 370). Peterson noted plaintiff was "very unclear" on how the accident occurred and denied feeling manic or currently suicidal. (Id.). Plaintiff would later report having run a red light on purpose. (Tr. 385). Peterson noted that while plaintiff reported feeling stressed and anxious about not having an income, she was "unclear about her symptoms." (Tr. 370).

On October 22, 2007, PMHNP Holt noted that plaintiff was more alert and reported taking her medications as prescribed. (Tr. 372). He noted that plaintiff reported being depressed and having a "fractured sleeping pattern," but denied experiencing and did not demonstrate psychotic distortions (e.g. hallucinations, delusions, obsessions, and phobias), shifts or changes in mood, or suicidal ideations. (Id.). Holt assessed plaintiff as suffering from mood as well as anxiety disorders NOS, with partial remission of the symptoms per plaintiff's report, and from R/O bipolar I, bipolar II disorder, and social phobia. (Id.). Holt adjusted plaintiff's Clonazepam prescription and added Lexapro to her medications. (Tr. 373).

On October 31, 2007, plaintiff reported to QMHP Peterson that she was sleeping "OK" but having more "bad days" than "good days" in the past week, and was coping by talking to her mother, her son, and playing with her grandson. (Tr. 374).

On November 12, 2007, plaintiff reported to PMHNP Holt that after three weeks on her adjusted Depakote, Clonazepam, and Lexapro prescriptions, she continued to suffer a depressed mood but was awakening less frequently at night and was able to "readily" fall back asleep with a second dose of Clonazepam. (Tr. 375). Plaintiff continued to deny, and did not demonstrate, psychotic distortions or suicidal ideation. (Id.). Holt again assessed plaintiff as suffering mood and anxiety disorders NOS with partial remission of symptoms, R/O Bipolar I, Bipolar II disorder, and social phobia, and continued her medications "as currently prescribed." (Tr. 376). Plaintiff also saw QMHP Peterson on November 12. (Tr. 377). Peterson noted that plaintiff reported continued depression, strain and worry due to finances and her son's impending incarceration. (Id.). Plaintiff denied suicidal ideation and reported that she would lie in bed "often," but would also "clean[] the house and play[] with her grandson." (Id.).

On November 26, 2007, QMHP Peterson noted that plaintiff reported taking her medications as prescribed, attending more to her activities of daily living ("ADLs"), cooking more often, and spending time caring for her new granddaughter. (Tr. 380). Plaintiff also reported she had been denied unemployment and social security benefits, and acknowledged being "aware she is brighter." (Id.).

On December 13, 2007, PMHNP Holt noted that plaintiff reported that she continued to experience a depressed mood despite taking her medications as prescribed, but denied recent hypomania vs. mania mood shifts. (Tr. 381). Holt noted plaintiff's affect was flat with no changes or shifts in mood, but occasionally tearful. (Id.). He noted no obvious indications of psychomotor retardation or agitation. (Id.). Plaintiff denied and did not demonstrate psychotic distortions or suicidal ideation. (Id.). Holt increased plaintiff's Lexapro dosage but otherwise continued her medications as prescribed. (Id.). Plaintiff also saw QMHP Peterson on December

13, who noted that plaintiff reported taking her medications as prescribed, that her ADL's were good, that she was feeling "OK," and that she was contemplating returning to work due to being "bored." (Tr. 382).

QMHP Peterson next saw plaintiff in January 2008. (Tr. 383-385). On January 10, plaintiff was tearful when describing her daughter's miscarriage and their subsequent argument. (Tr. 383). On January 17, plaintiff's mother called to cancel plaintiff's appointment, reporting that plaintiff was depressed, not attending to her ADLs, and isolating. (Tr. 384). Peterson noted that plaintiff's mother expressed anger that plaintiff had been denied social security benefits and wanted Cascadia to "do something." (Id.). On January 25, plaintiff reported that she was currently depressed but had been manic the week before, obsessively cleaning and not sleeping for three days. (Tr. 385). Plaintiff reported suffering from suicidal ideations on an almost daily basis, and that her mother was living with her. (Id.). Plaintiff stated she was not taking her Depakote as prescribed and reported significant family stressors including her daughter's miscarriage, their subsequent argument, and her son going to jail. (Id.).

On February 11, 2008, PMHNP Holt noted that plaintiff reported taking less Depakote than prescribed. (Tr. 387). Holt found that plaintiff's reports of possible syncope and sedation secondary to higher doses of Depakote "seem[] less likely with the length of time [plaintiff] has taken this medication." (Id.). Holt noted plaintiff reported a persistent depressed mood; denied recent mood shifts to hypomania vs. mania; did not demonstrate mood shifts but was occasionally tearful; and denied and did not demonstrate psychotic distortions and suicidal/homicidal ideation. (Id.). Holt discontinued plaintiff's Depakote and Lexapro prescriptions, continued her Clonazepam prescription, and initiated prescriptions for Zoloft and Zyprexa. (Id.). Plaintiff also had an appointment with QMHP Peterson on February 11. (Tr.

389). In contrast to PMHNP Holt's report, Peterson noted that plaintiff reported increased

depression, poor memory, staying in bed all day, thinking "life is not worth living," and past

thoughts of suicide by police. (Tr. 389). Peterson noted plaintiff was interested in a change in

medication and requested that her recent progress notes be sent to her social security benefits

lawyer. (Id.).

On February 25, 2008, plaintiff reported to QMHP Peterson that she felt "at peace" with

herself, that she was getting up more and doing more activities with her husband and mother, not

feeling stressed, and feeling less anxious and more motivated. (Tr. 392). Family stressors

continued to be an issue, but plaintiff stated she was "feeling better." (Id.).

On March 10, 2008, PMHNP Holt saw plaintiff for the last time. (Tr. 393). Plaintiff

reported she was taking her Clonazepam, Zoloft, and Zyprexa as prescribed, and experiencing a

"substantial decrease in the severity/frequency of a depressed mood," coinciding with "episodes

of elevated or unmanageable anxiety," but denied recent mood shifts from hypomania vs. mania.

(Id.). Plaintiff denied any medication side effects, including the absence of EPS, and Holt found

no obvious indications of psychomotor retardation and agitation. (Id.). Plaintiff denied and did

not demonstrate psychotic distortions or suicidal/homicidal ideation. (Id.). Holt increased

plaintiff's Zoloft and Zyprexa dosages and continued her Clonazepam. (Id.). Plaintiff also saw

QMHP Peterson on March 10, and reported that she was feeling better, crying less, getting her

ADLs and chores done, but was moving in with her mother due to financial stress and continued

to experience anxiety about being in public alone. (Tr. 394).

Plaintiff was next seen on May 7, 2008, by Brooke Sheehan, PMHNP, at Cascadia. (Tr.

396). PMHNP Sheehan noted that plaintiff "[s]tates she is doing well on her medicines but

noticed that she does switch into hypomanic like moods about every two weeks." (Id.). Plaintiff

did not report any side effects from her medications and denied suicidal/homicidal ideations, but
reported waking every two hours despite the Clonazepam. (Id.). Sheehan continued plaintiff's
medications and scheduled a follow up visit. (Id.). Plaintiff also had an appointment with
QMHP Peterson on May 7. (Tr. 397). Peterson noted that plaintiff reported having more "good
days" than "bad days" and feeling stable on her medications, although she continued to
experience anxiety when in crowds. (Id.). Peterson recommended plaintiff continue exercising,
get out more, and practice using calming techniques when in crowds. (Id.).

On June 18, 2008, both PMHNP Sheehan and QMHP Peterson saw plaintiff again. (Tr.
398-399). To PMHNP Sheehan, plaintiff reported taking her medications "regularly and
consistently" and being "mostly stable." (Tr. 398). Plaintiff denied depressed moods, crying
spells, and hypomanic episodes, but described continued problems sleeping and anxiety when in
crowded places. (Id.). Plaintiff did not report experiencing any side effects from her
medications, denied suicidal/homicidal ideation and "interacted well with her infant
granddaughter," whom plaintiff brought with her to the visit. (Id.). PMHNP Sheehan continued
plaintiff's Zyprexa and Zoloft prescriptions, discontinued the clonazepam, and initiated
temazepam. (Id.). To QMHP Peterson, plaintiff reported she had been tanning, going for walks,
driving again, caring for her grandchild twice a week, experiencing decreased depression and no
crying spells, but continued to have "fractured sleep" and anxiety when in crowds. (Tr. 399).

On August 12, 2008, QMHP Peterson completed an annual Mental Health Assessment
("the 2008 Assessment"), which PMHNP Sheehan also signed off on. (Tr. 400-403). The 2008
Assessment records a DSM diagnosis of Bipolar I Disorder, most recent episode depressed, mild;
Anxiety Disorder NOS; and Social Phobia, with a current GAF of 63. (Tr. 400). While plaintiff
continued to experience "some difficulty" with sleep and "some panic" in public places, her

mood had been stable and her "[p]rognosis is good if [plaintiff] continues with medication management and counseling." (Id.). Plaintiff reported an average amount of exercise and being able to complete ADLs independently, denied physical health issues and suicidal ideations, and rated her depression as 2 out of 10 and her anxiety as 3 out of 10. (Tr. 400-401). The 2008 Assessment found plaintiff to be "employable" despite plaintiff's belief that she could not return to work, and noted that plaintiff acknowledged she was doing better than she had been a year ago and that she was aware that her mood was "more stable." (Tr. 402).

On September 2, 2008, PMHNP Sheehan saw plaintiff again, noting plaintiff reported her moods had been stable and her clonazepam "works for sleep" although she would need to take another in the middle of the night "every once in a while" and was unable to sleep without it. (Tr. 406). Plaintiff reported she was enrolling in the "project independence program at PCC," denied psychotic symptoms or suicidal/homicidal ideations, did not report any side effects or symptoms from her medications. (Id.). Sheehan continued plaintiff's clonazepam (Klonopin), Zyprexa, and Zoloft, and scheduled a follow up appointment. (Tr. 406-407). Plaintiff also saw QMHP Peterson on September 2, and reported taking her medications, sleeping well, exercising daily, enrolling at PCC and planning to move to a new apartment in October. (Tr. 408). However, plaintiff also reported having a "depressive phase" approximately three weeks earlier marked by crying spells, promiscuous thoughts, and isolating behavior. (Id.).

On September 18, 2008, plaintiff reported to QMHP Peterson that her husband had lost the use of his legs due to MS the week before, and she was now caring for him at home but reported doing "fine" despite the stress. (Tr. 409).

On September 30, 2008, plaintiff saw both PMHNP Sheehan and QMHP Peterson. To PMHNP Sheehan, plaintiff appeared tired and her mood "depressed," but she reported that she

continued to be stable on her medications, had no suicidal/homicidal ideations, and reported no

side effects or symptoms due to her medications. (Tr. 410-411). To QMHP Peterson, plaintiff

reported that her medications were working, that she and her husband had moved into their own

apartment, that she did not feel depressed, and that she was enjoying being in school. (Tr. 412).

On November 13, 2008, QMHP Peterson saw plaintiff again. (Tr. 413). Plaintiff

reported she had been arrested for shoplifting at WalMart on September 30, and, after failing to

take her medication for several days, had suffered a "meltdown" at school during which she

nearly hit another student. (Id.). Plaintiff reported feeling agoraphobic and requested her next

visit be a home visit as she was having difficulty leaving her house. (Id.). When QMHP

Peterson visited plaintiff at her home on November 24, plaintiff reported she was feeling less

anxious and had returned to school. (Tr. 414). Plaintiff was noted a "no show" for her next two

appointments with Peterson. (Tr. 415, 418).

On January 14, 2009, plaintiff was seen at Cascadia by Mary Welch, PMHNP. (Tr. 416-

417). PMHNP Welch noted that plaintiff's "[m]ost problematic symptom is explosive anger"

but did not describe any recent incidents of this behavior. (Tr. 416). Welch also noted that

plaintiff reported having impulses to steal when angry and tended to isolate when "feeling

down." (Id.). However, plaintiff reported that Zyprexa had been effective in stabilizing her

mood and treating her auditory hallucinations without causing sedation. (Id.). Plaintiff gave

conflicting accounts regarding her difficulties with sleep, reporting that she continued to have

difficulty sleeping but also stating that Klonopin (clonazepam) had been effective for sleep.

(Id.). Welch noted plaintiff was psychomotorically slowed, had slowed speech and a blunted

affect, but observed no hallucinations or suicidal or homicidal ideation, and noted that plaintiff

did not report any side effects or symptoms from her medications. (Tr. 416-417). Welch

recommended plaintiff get a full physical, continued her medications as prescribed, and scheduled a follow up appointment. (Id.).

PMHNP Welch did not see plaintiff again until April 2009. (Tr. 419-420). On April 13, plaintiff reported having poor sleep for the past two weeks due to running out of clonazepam, having arguments with her husband about money, and that she had been enjoying spending time with her grandchildren. (Tr. 419). Welch noted plaintiff's affect was "brighter" and observed no psychomotor slowness, hallucinations, cognitive abnormalities, or suicidal/homicidal ideations. (Tr. 419-420). Welch noted plaintiff did not report any side effects or symptoms due to her medications, found her to be "[s]table on current medications" and continued plaintiff's Zyprexa, Zoloft, and Clonazepam prescriptions. (Tr. 420). Plaintiff also saw QMHP Peterson on April 13, who noted plaintiff reported spending time with her grandchildren, doing chores, and shopping. (Tr. 421). Plaintiff reported she had not experienced any recent manic episodes and while she had felt "down" lately, she had not felt "depressed." (Id.). Plaintiff reported friction with her husband, feeling irritable and "thinking too much," corresponding with exhausting her clonazepam prescription and poor sleep. (Id.). Plaintiff was noted a "no show" for her next two appointments with Peterson. (Tr. 422, 425).

On June 4, 2009, PMHNP Welch saw plaintiff again. (Tr. 423-424). Plaintiff reported she had been sleeping well but that a month supply Clonazepam was not lasting 30 days. (Tr. 423). Welch discussed concerns that plaintiff may be developing a tolerance or possibly an addiction to Clonazepam and the risk of seizures in the event of withdrawal, and noted plaintiff's agreement to only use clonazepam as prescribed. (Id.). Welch observed that plaintiff's speech was soft and her affect depressed, but observed no hallucinations, cognitive symptoms, suicidal or homicidal ideations. (Tr. 423-424). Welch noted that plaintiff did not report any side effects

or symptoms due to her medications, continued her medications as prescribed, and told plaintiff to notify Cascadia in the event that she should lose her Oregon Health Plan benefits, so that referrals to appropriate agencies could be made. (Id.).

On July 9, 2009, QMHP Peterson completed an annual Mental Health Assessment for plaintiff ("the 2009 Assessment"), which PMHNP Welch also signed off on. (TR. 429-433). The 2009 Assessment records a DSM diagnosis of Bipolar I Disorder, most recent episode depressed, mild; Anxiety Disorder NOS; and Social Phobia, with a current GAF of 63. (Tr. 429). While plaintiff continued to experience anxiety and some panic when in public, her mood had been stable and her "[p]rognosis is good if [plaintiff] continues with medication management and counseling." (Id.). The 2009 Assessment found that plaintiff had no history of suicide, but rated her as a low risk due to an episode of suicidal ideation some three weeks prior to the assessment, when plaintiff kept a handgun in her bed after finding out that her grandson had been "kidnapped" by his paternal grandmother. (Tr. 429-430). Plaintiff rated her current anxiety as 10 out of 10 due to the situation with her grandson and status of her social security benefits application, and rated her depression as 1 out of 10 currently but 8 out of 10 two weeks earlier. (Tr. 430). Besides recent significant gains and losses of weight, plaintiff reported no physical health issues. (Tr. 429-430). Plaintiff reported an "active lifestyle," had no current sleep concerns, and was able to complete ADLs independently. (Tr. 430-431). The 2009 Assessment found plaintiff to be "employable," despite plaintiff's belief that she could not work. (Tr. 431). Plaintiff acknowledged that she was aware that she was doing better than a year ago and that her mood was "more stable." (Tr. 432).

Also on July 9, 2009, PMHNP Welch saw plaintiff for a follow up appointment, and noted that plaintiff "presented with brighter and more animated affect," reported increased

exercise at a health club, adequate sleep, and improved mood, but also expressed concern about her social security benefits hearing scheduled for August. (Tr. 434). Welch again observed no hallucinations, cognitive symptoms, or suicidal or homicidal ideations, and noted that plaintiff did not report any side effects or symptoms due to her medications. (Tr. 434-435).

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence, or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995) (*citing* Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989)). In this context, the term "substantial evidence" means "more than a mere scintilla, but less than a preponderance--it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Id.; *see also* Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992). When determining whether substantial evidence exists to support the Commissioner's decision, the court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible of more than one rational interpretation, the court must defer to the Commissioner's conclusion. Moncada, 60 F.2d at 523.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. Howard v. Heckler, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42

U.S.C. § 423(d)(1)(A).  A five-step sequential process is used to determine whether a person is disabled.  20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987); Lester v. Chater, 81 F.3d 821, 828 n. 5 (9th Cir. 1995), *as amended* (Apr. 9, 1996).

At the first step, the Commissioner determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled and the claim is denied.  20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I).  If not, the inquiry moves to the second step.

At the second step, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments that meets the twelve-month durational requirement.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii).  If claimant does not have such a severe impairment, she is deemed not disabled.  Id.  If the claimant·has a severe impairment or combination thereof, the inquiry moves to the third step.

At the third step, the Commissioner determines whether the claimant's severe impairment meets or equals a "listed" impairment in the regulation.  20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii); 20 C.F.R., Part 404, Subpart P, Appendix 1 ("the Listing").  If so, disability is conclusively presumed and benefits are awarded.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the Commissioner must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC") before proceeding beyond step three of the disability analysis.  20 C.F.R. §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p. The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, and should reflect the claimant's maximum remaining ability to perform sustained work activities in an ordinary work setting for eight hours a day, five days a week despite limitations imposed by her impairments.

SSR 96-8p.  The RFC assessment must include a narrative discussion describing how the

evidence supports each conclusion, citing specific medical and non-medical facts.  Id.  The RFC

is based on all relevant evidence in the case record, including the treating physician's medical

opinions about what an individual can still do despite impairments.  Id.

At the fourth step, the Commissioner uses this information to determine whether the

claimant can still perform her "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(iv);

416.920(a)(4)(iv).  If the claimant has sufficient "residual functional capacity" to perform her

past work, she is not disabled and the claim is denied.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If

the claimant meets this burden, a prima facie case of disability is established and the inquiry

advances to step five.

At the fifth and final step, the burden shifts to the Commissioner to establish that the

claimant is capable of performing other work that exists in the national economy.  20 C.F.R. §§

404.1520(a)(4)(v), 416.920(a)(4)(v); Yuckert, 482 U.S. at 142; Tackett v. Apfel, 180 F.3d 1094,

1099 (9th Cir. 1999).  If the Commissioner fails to meet this burden, the claimant is deemed

disabled.  20 C.F.R. §§ 404.1520(g), 404.1566, 416.920(g), 416.966.

## THE ALJ'S FINDINGS

In the present case, the ALJ found that plaintiff had not engaged in substantial gainful

activity since August 31, 2007, the alleged onset date of disability.  (Tr. 12).

At the second step, the ALJ found that plaintiff suffered from the following medically

determinable impairments:  right knee arthrosis, bipolar disorder, and anxiety.  (Id.).  The ALJ

concluded that these impairments "result in significant work-related functional limitations." (Id.).

At step three of the analysis, the ALJ found that plaintiff did not have an impairment or

combination of impairments that meets or medically equals one of the listed impairments in 20

CFR Part 404, Subpart P, Appendix 1. (Id.). Specifically, the ALJ found that (1) plaintiff's right knee impairment did not meet or equal the criteria of any listed impairment; and (2) plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04 and 12.06. (Id. at pp. 12-13). In so doing, the ALJ incorporated his findings using the psychiatric review technique required by 20 C.F.R. § 404.1520a, finding that the "paragraph B" criteria were not satisfied and that the evidence failed to establish the presence of the "paragraph C" criteria. (Id. at pp. 13).

The ALJ found that plaintiff has the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently, stand and walk 2 hours out of an 8-hour work day, sit for 6 hours out of an 8-hour work day, and is limited to simple, repetitive tasks with not interaction with the general public and only occasional interaction with supervisors and coworkers. (Tr. 13). The ALJ's conclusion is supported by a narrative discussion describing how the evidence supports his assessment of plaintiff's physical and mental limitations, and cites specific medical and non-medical facts. (Tr. 13-17).

At the fourth step of the analysis, the ALJ found that plaintiff could not perform her past relevant work. (Tr. 17). In so finding, the ALJ specifically found credible the testimony of the vocational expert.

At the fifth and final step of the analysis, the ALJ found that plaintiff would be able to perform other work existing in the national economy. (Id.). Accordingly, the ALJ determined that plaintiff is not disabled. (Tr. 18).

## DISCUSSION

Plaintiff argues that the ALJ erred in his assessment of her RFC by improperly discrediting her subjective statements, the statements of her lay witness, and the opinion of Mary

Welch, Psychiatric and Mental Health Nurse Practitioner ("PMHNP"). Plaintiff contends that as a result of these errors, the ALJ's RFC assessment does not accurately reflect all of her functional limitations. She further argues that the ALJ elicited testimony from the vocational expert ("VE") with improper assumptions based on the erroneous RFC assessment which, in turn, undermines the ALJ's conclusion that plaintiff is capable of working. To prevail on her Title II claim for disability insurance benefits, plaintiff must show that she was disabled within the meaning of the Social Security Act on or before the date she last satisfied the insured status requirements of the Act. 42 U.S.C. § 423(a)(1)(A); *see* Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). There is no insured status prerequisite for her Title XVI claim. 42 U.S.C. § 1382(a). However, supplemental security income payments cannot be made retroactively. 20 C.F.R. §§ 416.203, 416.501; SSR 83-20, 1983 WL 31249.[5] Therefore, the relevant period for plaintiff's Title XVI claim commenced on September 11, 2007, when she filed her application.

## I. THE ALJ PROPERLY CONSIDERED THE MEDICAL RECORD

Plaintiff argues the ALJ committed reversible error by improperly discrediting the opinion of Mary Welch, Psychiatric and Mental Health Nurse Practitioner ("PMHNP"), regarding her functional capabilities. Specifically, plaintiff argues that the ALJ erred by (1) rejecting PMHNP Welch's opinion because she "is not an acceptable medical source"; (2) failing to identify the portions of the medical record which negate PMHNP Welch's opinion; and (3) failing to question PMHNP Welch about the basis of her conclusions pursuant to his duty to develop the record. (Pl.'s Opening Br., pp. 26).

---

[5] Social Security rulings are binding on the Administration. *See* Terry v. Sullivan, 903 F.2d 1273, 1275 n. 1 (9th Cir. 1990). Such rulings reflect the official interpretation of the Social Security Administration and are entitled to some deference as long as they are consistent with the Social Security Act and regulations. Massachi v. Astrue, 486 F.3d 1149, 1152 n. 6 (9th Cir. 2007).

### A. Standard

In a disability proceeding, the ALJ must consider the opinions of "acceptable medical sources." 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-2p; SSR 96-6p. "Acceptable medical sources" include licensed physicians and psychologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). Only an "acceptable medical source" can: (1) establish the existence of a medically determinable impairment; (2) provide a medical opinion; and (3) be considered a treating source. SSR 06-3p (summarizing regulations). To reject the opinion of a treating or examining doctor, the ALJ must provide clear and convincing reasons if the opinion is uncontroverted, and specific and legitimate reasons if the opinion is controverted. Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010) (internal citations and quotation marks omitted).

In addition to evidence from "acceptable medical sources," the ALJ may also use evidence from "other sources," such as nurse practitioners, physicians' assistants, therapists, teachers, social workers, and spouses. 20 C.F.R. §§ 404.1513(d), 416.913(d). "Information from other sources cannot establish the existence of a medically determinable impairment." SSR 06-3p. Evidence from "other sources," whether medical (e.g. nurse practitioners, physicians' assistants) or non-medical (e.g. social workers, spouses) may be used only to show the severity of an individual's impairment and how it affects the individual's ability to work. SSR 06-3p; 20 C.F.R. §§ 404.1513(d), 416.913(d). To reject the opinion of an "other source," the ALJ need only provide "reasons germane to each witness for doing so." Turner, 613 F.3d at 1224 (*quoting* Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001)).

### B. Mental Impairment Questionnaire Completed By PMHNP Welch

On June 25, 2009, PMHNP Welch completed a "Mental Impairment Questionnaire (RFC & Listings)" ("the 2009 Questionnaire") at the request of plaintiff's counsel. (Tr. 337-344). The

ten-page questionnaire consists of 31 questions in yes/no, short answer, and checklist form.
PMHNP Welch completed the 2009 Questionnaire based on the three appointments she had with
plaintiff on January 14, April 13, and June 4 of 2009, described in detail above. (Tr. 337).
Welch identified plaintiff as suffering from Bipolar I Disorder, Anxiety Disorder NOS, and
Social Phobia, with a current GAF score of 55, and for GAF scores in the past year noted a
"high" of 63, "low" of 51, and "typical" score of 63. (Id.). In response to the question of when
plaintiff became continuously unable to work, Welch responded: "January 2009 no longer able
to work part time from home. I did not work with [plaintiff] prior to 1/09." (Tr. 343).

Using the provided checklist, PMHNP Welch identified the symptoms associated with
plaintiff's diagnoses as: decreased energy; blunt, flat or inappropriate affect; mood disturbance;
sleep disturbance; apprehensive expectation; impairment in impulse control; intense and unstable
interpersonal relationships and impulsive and damaging behavior; and bipolar syndrome with a
history of episodic periods manifested by the full symptomatic picture of both maniac and
depressive syndromes (and currently characterized by either or both syndromes). (Tr. 337-338).
In the space provided for remarks, Welch noted plaintiff "has had episodes of explosive anger
and is anxious an episode may recur." (Id.). Welch listed plaintiff's current GAF of 55 as the
sole "clinical finding" demonstrating the severity of plaintiff's mental impairment and
symptoms. (Tr. 339). Welch opined that plaintiff was not a malingerer and that her impairments
were reasonably consistent with the symptoms and functional limitations described in the
questionnaire. (Id.).

PMHNP Welch indicated plaintiff was currently prescribed Zyprexa, Klonopin, and
Zoloft, but left blank the short answer question requesting a description of plaintiff's treatment
and response. (Id.). Under medication side effects, Welch noted only drowsiness. (Tr. 339-

340). Welch answered "yes" to yes/no answer questions regarding whether plaintiff would experience difficulties with stamina and need to work at a reduced pace if working a full-time, eight-hour work day, and whether doing so would likely have a negative effect on "one or more of [plaintiff's] health problems." (Tr. 340). Welch indicated plaintiff's ability to maintain a normal pace in a full-time, eight-hour work day was very poor, characterized plaintiff's "experience with stamina and/or fatigue" as 7 on a scale of 10, with 10 being "total failure," and indicated that plaintiff could be expected to have up to four absences per month from work due to impairments or associated treatments. (Tr. 340-341). Welch answered "yes" to yes/no questions regarding whether plaintiff would have difficulty getting along with supervisors, co-workers, and members of the public if working a full-time, eight-hour work day. (Tr. 341). Welch answered "no" to questions regarding whether plaintiff's psychiatric condition resulted in pain or physical symptoms, had a low I.Q. or reduced intellectual functioning, or had a condition expected to result in death or tending to degenerate or deteriorate over time, and left the short answer question regarding plaintiff's prognosis blank. (Tr. 340-341).

In the section titled "Mental Abilities and Aptitudes Needed to do Unskilled Work," PMHNP Welch indicated plaintiff had no limitations on her abilities to remember work-like procedures, understand, remember, and carry out very short and simple instructions, and make simple work-related decisions; was "slightly limited" in her ability to maintain attention for two-hour segments, sustain an ordinary routine without special supervision, ask simple questions or request assistance, and be aware of normal hazards and take appropriate precautions; was "mildly limited" in her ability to maintain regular attendance and be punctual within customary, usually strict tolerances, work in coordination with or proximity to others without being unduly distracted, and perform at a consistent pace and without an unreasonable number and length of

rest periods; was "moderately limited" in her ability to accept instruction from and respond appropriately to criticism from supervisors and changes in a routine work place; and was "markedly limited" in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and deal with normal work stress. (Tr. 342-343). Under "medical/clinical findings" supporting her assessment, PMHNP Welch stated "[plaintiff's] anxiety, mood swings, and social phobia limit her ability to interact with co-workers, supervisors, and clients/customers." (Tr. 343).

On a scale of "none" to "continual," Welch indicated "none" for functional limitations restricting plaintiff's activities of daily living; "seldom" for deficiencies of concentration, persistence or pace; "repeated" for "episodes of deterioration of [sic] decompensation"; and "marked" for difficulties in maintaining social functioning. (Tr. 343). Finally, Welch answered "yes" to the yes/no question of whether she would expect plaintiff's GAF score to decline as the result of stresses resulting from a 8-hour a day, 40-hour workweek. (Tr. 344).

### C. Discussion

Plaintiff asserts three separate grounds for finding that the ALJ committed reversible error with regard to the 2009 Questionnaire.

#### 1. PMHNP Welch's status as an "other" source

Plaintiff argues that the ALJ committed reversible error by rejecting the 2009 Questionnaire solely on grounds that Welch was not an "acceptable medical source." Plaintiff misreads the ALJ's decision. The ALJ's decision states: "Ms. Welch is not an acceptable medical source and her opinion is not consistent with the treatment record. It is given little weight." (Tr. 15-16). The ALJ's notation that PMHNP Welch is not an "acceptable medical

source" is a correct statement of law.  Moreover, it is self-evident from the ALJ's statement that

he did not disregard PMHNP Welch's opinion.  To the contrary, he considered it and afforded it

"little weight" on grounds that it was inconsistent with the medical record.  As described below,

the ALJ provided "germane" reasons for discrediting the 2009 Questionnaire; therefore he did

not err by affording it "little weight."

### 2. The characteristics of plaintiff's bipolar disorder

Next, plaintiff argues that the ALJ improperly characterized the 2009 Questionnaire as

"inconsistent" with the medical record, because the variations in the medical record simply

reflect the reality that the symptoms associated with her bipolar disorder "wax and wane" over

time.  An ALJ must give "germane" reasons for discounting evidence provided by an "other

source."  Turner, 613 F.3d at 1224 (*citing* Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001)).

Inconsistency with medical evidence is a germane reason for rejecting such evidence.  Bayliss v.

Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005).  The ALJ noted that the 2009 Questionnaire,

completed June 25, recorded a current GAF score of 55 and placed heavy emphasis on plaintiff's

inability to sustain regular full-time employment due to problems with stamina, fatigue, and

interruptions and absenteeism attributable to her psychologically based symptoms and

treatments.  The ALJ found this assessment to be inconsistent with PMHNP Welch's June 4

treatment notes, which show that plaintiff reported sleeping well, was not experiencing any

symptoms or side effects due to her medications, was not having hallucinations or cognitive

symptoms, and was not experiencing any difficulties with concentration or attention.  The ALJ

also found the 2009 Questionnaire to be inconsistent with the 2009 Mental Health Assessment

that PMHNP Welch signed off on, which recorded a current GAF score of 63 and indicated that

plaintiff was completing ADLs independently, had an "active lifestyle," was exercising, had no

current sleep problems, and that plaintiff that her mood had been "stable" despite fluctuating

anxiety and depression levels corresponding with situational stressors. The 2009 Assessment

concluded that, with continued medication management and counseling, plaintiff's prognosis

was "good" and that plaintiff was "employable" despite her subjective belief to the contrary.

It is evident from the record that plaintiff has struggled over time with several issues

symptomatic of bipolar disorder, such as sleep problems, irritability and angry outbursts,

depression, auditory hallucinations, suicidal ideation, and racing thoughts. There is no question

that plaintiff's symptoms have been disruptive both in the workplace and to her personal

relationships. Without her medications, plaintiff experiences significant mood swings, is prone

to impulsive and damaging behavior when angry, struggles to achieve and sustain healthy

sleeping patterns, and has experienced auditory hallucinations urging her to commit suicidal and

homicidal acts. It appears to this court that plaintiff's challenges are real and not insubstantial.

However, the record supports the ALJ's determination that plaintiff's symptoms are

responsive to treatment by medication. PMHNP Welch's treatment notes reflect that plaintiff

had sleep problems, but also that medications effectively treated these problems. While Welch

noted that plaintiff's "most problematic symptom is explosive anger," none of Welch's progress

notes indicate that plaintiff demonstrated this behavior during any of her visits with Welch or

reported any new incidents of this behavior while she was under Welch's care. Instead, Welch

noted that "Zyprexa has been effective in stabilizing [plaintiff's] mood" and in treating plaintiff's

auditory hallucinations. This notation is consistent with the medical record. In 2005, Dr. Arthur

successfully treated plaintiff for complaints of mania and insomnia, noting that plaintiff's sleep

patterns were normal on Zyprexa and that Oxazepam was effective for treating her anxiety. In

2006, Dr. Arthur noted that plaintiff reported Zyprexa successfully treated auditory

hallucinations.  In 2007, while receiving care at Cascadia, plaintiff struggled reported feeling

sedated and alternately depressed and manic while taking Depakote and Lexapro.  In early

February 2008, PMHNP Holt discontinued plaintiff's Depakote and Lexapro prescriptions and

substituted Zoloft and Zyprexa.  At a follow up appointment two weeks later, plaintiff reported

"feeling better," and over the course of five appointments in the next seven months reported a

"substantial decrease" in the severity and frequency of her depressed moods, feeling better,

having more good days than bad days, and being mostly stable in her moods.  The setbacks in

her progress, for example her "meltdown" in November 2008, coincide with plaintiff's reports

that she had not been taking her medications as prescribed.

From this record, the ALJ could reasonably determine that a correlation existed between

plaintiff's failure to take her prescription medications and the flaring up of her psychiatric

symptoms.  Plaintiff's progressively positive responses to adjustments in her medications support

the ALJ's determination that her symptoms could be controlled with proper medication

management and care.  This determination is consistent with PMHNP Welch's treatment notes,

and is also consistent with the opinion of Dr. Anderson, the agency's reviewing psychologist,

who is the only acceptable medical source besides Dr. Arthur whose opinion is a part of the

record in this case.  *See* Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) ("The opinions of

non-treating or non-examining physicians may . . . serve as substantial evidence when the

opinions are consistent with independent clinical findings or other evidence in the record.").  In

sum, the ALJ's determination that PMHNP Welch's opinion, as expressed in the 2009

Questionnaire, was inconsistent with her own treatment notes and the medical record as a whole,

is a reasonable interpretation of the evidence and is supported by substantial evidence in the

record, therefore, he provided a sufficient basis to accord it limited weight.

### 3.  The ALJ's duty to develop the record

Finally, plaintiff argues that the 2009 Questionnaire is the only functional assessment, physical or mental, from a treating or examining source, therefore, to the extent that 2009 Questionnaire is inconsistent with PMHNP Welch's own treatment notes, the ALJ had a duty to question PMHNP Welch regarding the conflicting evidence.  The ALJ has a duty throughout the proceedings "to fully and fairly develop the record and to assure that the claimant's interests are considered."  Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983); see also 20 C.F.R. §§ 416.912(e), 416.1444.  Rather than proceeding as a "mere umpire" at the administrative hearing, the ALJ has an independent duty to fully develop the record.  Higbee v. Sullivan, 975 F.2d 558, 561 (9th Cir. 1992).  However, the ALJ's duty to develop the record is "triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  Here, the medical records included in the administrative transcript include treatment and progress notes covering four years; annual mental health assessments from 2007, 2008, and 2009 completed by plaintiff's treating psychiatric mental health nurse practitioners at Cascadia; and a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity Assessment ("MRFCA") completed in October 2007 by Dr. Anderson, the agency's consulting psychologist.  While the 2009 Questionnaire differed from previous and subsequent assessments and treatment notes, it did not create ambiguity in the medical record.  Rather, it created a conflict in the medical evidence which the ALJ was required to evaluate and resolve.  See Thomas, 278 F.3d at 956-57 (in the face of conflicting medical evidence, it is the sole province of the ALJ to determine credibility and resolve the conflict).  As described above, substantial evidence supports the ALJ's determination in that regard.  Contrary

to plaintiff's assertion, the record before the ALJ was neither ambiguous nor inadequate to allow for proper evaluation of the evidence. Therefore, the ALJ was under no duty to further develop the record and committed no error by not questioning PMHNP Welch regarding the 2009 Questionnaire.

### Conclusion

For the reasons stated above, the ALJ's determination regarding the weight due PMHNP Welch's opinion as expressed in the 2009 Questionnaire is a reasonable interpretation of the evidence, which is supported by substantial evidence in the record.

## II. THE ALJ PROPERLY DISCOUNTED PLAINTIFF'S CREDIBILITY

Plaintiff argues that the ALJ committed reversible error by failing to provide clear and convincing reasons for rejecting her testimony regarding the functional restrictions caused by her bipolar disorder, knee pain and hand tremors. (Pl.'s Opening Br., pp. 19-23; Pl.'s Reply Br., pp. 4-6).

### Standard

The ALJ may consider several factors when weighing the claimant's credibility, including: claimant's reputation for truthfulness; inconsistencies in claimant's testimony and between claimant's testimony, conduct, and daily activities; claimant's work record; and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms complained of. Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005); Thomas, 278 F.3d at 958-59. "An ALJ is not 'required to believe every allegation of disabling pain' or other non-exertional impairment." Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (*quoting* Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)). However, the ALJ must provide "specific, cogent reasons" for discrediting a claimant's testimony when a medical impairment has been established.

Morgan, 169 F.3d at 599 (*quoting* Lester, 881 F.3d at 834). If the ALJ finds the claimant's testimony regarding her symptoms and limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. Id. Absent evidence that the claimant is malingering, the ALJ must provide clear and convincing reasons for rejecting the claimant's testimony. Id. The court will not second-guess the ALJ's credibility finding if it is supported by substantial evidence in the record. Thomas, 278 F.3d at 959.

**Discussion**

Here, the ALJ determined that plaintiff's impairments could reasonably be expected to produce some degree of the symptoms she alleged, but found that her statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they are inconsistent with the RFC assessment. (Tr. 15).

**1. Medication Side Effects**

At the hearing before the ALJ, plaintiff testified that she suffers from dizzy spells lasting approximately an hour, occurring on average three times per week, depending on when she takes her medication. (Tr. 31-32). She further testified that she experiences racing thoughts almost daily and problems maintaining concentration. (Tr. 32). The ALJ first found that while the medical record demonstrated plaintiff had complained of dizziness and sedation due to medications, these complaints were controlled by adjustments to her medications. Plaintiff's medical records support this determination. In August of 2007, plaintiff appeared sedated during appointments with PMHNP Holt and QMHP Peterson, and complained of sedation secondary to her Depakote prescription. In September 2007, plaintiff's Depakote dosage was increased and her Lamictal prescription was discontinued after plaintiff reported feeling dizzy and falling.

Plaintiff appeared less sedated and increasingly alert in appointments during late September and October of 2007, and did not thereafter report feeling sedated.

Plaintiff did not report dizziness again until February 11, 2008, at which time PMHNP Holt noted possible syncope as well as sedation secondary to the higher dose of Depakote. In response, PMHNP Holt discontinued plaintiff's Depakote and Lamictal prescriptions and initiated prescriptions for Zoloft and Zyprexa. There is no further mention of dizziness or sedation in plaintiff's treatment records. Rather, subsequent medical reports show that plaintiff either did not report or explicitly denied experiencing any side effects due to her medications. The effectiveness with which prescription medications alleviate symptoms is a relevant factor in determining the severity of the claimant's symptoms and their disabling effects. Huston v. Bowen, 838 F.2d 1125, 1132 (9th Cir. 1988). The ALJ's interpretation of the evidence here is reasonable and supported by the record.

### 2. Bipolar Disorder

The ALJ found plaintiff's reports of debilitating anxiety and depression to be inconsistent with her contemporaneous reports to her medical care providers regarding her activities of daily living and the effectiveness of her prescription medications. At the hearing, plaintiff testified that she suffered from daily anger outbursts; daily episodes of uncontrollable crying; and panic attacks three to four times per week, lasting an hour to an hour and a half, during which she lies in bed because she is unable to concentrate or function. (Tr. 28-29). Plaintiff testified that she suffers from deep depression which renders her unable to complete ordinary household chores, attend to her personal hygiene, or even get out of bed for days at a time. (Tr. 34). The record shows that plaintiff reported feeling mildly or moderately depressed in July, August, September and October of 2007. However, the ALJ noted plaintiff's steady reports of improved mood and

daily activities starting in November of 2007 and continuing through September of 2008. On November 12, 2007, plaintiff reported she would lie in bed "often," but also reported cleaning the house and playing with her grandson. On November 26, she reported attending more to her activities of daily living, cooking more often, and spending time caring for her new granddaughter. On December 13, plaintiff reported feeling "OK" and contemplating a return to work because she was bored.

Following a setback in January of 2008 and subsequent adjustment to her prescriptions in February, plaintiff reported a "substantial decrease in the severity/frequency of a depressed mood" and feeling better, crying less, and getting her ADLs and chores done despite episodic anxiety. In May, plaintiff reported having more "good days" than "bad days" and feeling stable on her medications, although she continued to experience anxiety in crowds. In June, plaintiff reported being "mostly stable," denied depressed moods and crying spells, and reported going on walks, driving again, caring for her grandchild twice a week, although she continued to experience anxiety in crowds. In September, plaintiff reported stable moods, exercising daily, sleeping well, and enrolling in school. In November, plaintiff reported a "meltdown" at school correlating with her failure to take her medications. In April 2009, plaintiff reported feeling "down" but not "depressed," spending time with her grandchildren, doing chores, and shopping. And in July 2009, plaintiff reported increased exercise at a health club, adequate sleep, and improved mood. Plaintiff is noted as having good hygiene and appearance at every appointment.

As the ALJ noted, the record reflects that by her own account, plaintiff experienced a continuous and gradual improvement in the severity and frequency of the symptoms associated with her anxiety and bipolar disorder, correlating with adjustments to her prescription medications starting in late 2007 and continuing through July of 2009. The effectiveness with

which prescription medications alleviate symptoms is a relevant factor in determining the severity of the claimant's symptoms and their disabling effects. Huston, 838 F.2d at 1132. While at times she suffered setbacks and relapses, these incidents generally coincide with plaintiff reporting that she had failed to take her medication as prescribed.

The record also supports the ALJ's determination that plaintiff's testimony regarding the extent and severity of the symptoms associated with anxiety and bipolar disorder is inconsistent with the record. While plaintiff testified that she is virtually unable to get out of bed due to panic attacks and suffers daily episodes of uncontrollable crying, the record shows that starting in November 2007 and continuing through July 2009, plaintiff reported she was increasingly able to attend to ADLs and daily chores, started driving again, provided weekly care for her grandchildren, enrolled in school, exercised daily, and contemplated going back to work because she was "bored." A claimant's daily activities may be used by the ALJ to show capability of performing competitive work on a sustained basis. Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (citing Morgan, 169 F.3d at 600); see also Burch, 400 F.3d at 680-81; Thomas, 278 F.3d at 959; Fair, 885 F.2d at 603. While plaintiff testified that she suffers daily episodes of explosive anger, plaintiff's contemporaneous records show that she reported an increasingly stable mood and only a single episode of anger, occurring in November 2008 after plaintiff neglected to take her medications as prescribed. A tendency to exaggerate is a legitimate consideration in determining credibility. Tonapetyan, 242 F.3d at 1148. On this record, the ALJ's interpretation of the evidence is reasonable and supported by the record.

### 3. Hand Tremors

The ALJ found that the medical record contained no evidence that plaintiff has ever reported hand tremors, shakiness, or dropping things. Plaintiff did not list hand impairments

among her disabling conditions on her benefits application. (Tr. 156-165). Nor did plaintiff indicate that she had any difficulties using her hands on her September 26, 2007, Function Report. (Tr. 207). The court has carefully scrutinized the entire record, and has not found a single reference to tremors or hand problems in any of plaintiff's treatment records, despite the fact that the form used by plaintiff's medical care providers at Cascadia require the provider to indicate whether the patient reported side effects resulting from medications. This is especially notable considering that, starting in September 2008, the form included a checkbox for "tremors/involuntary movements" in the section on medication side effects and symptoms. A claimant's failure to report symptoms or limitations to treatment providers is a legitimate consideration in determining the credibility of those complaints. Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006). The ALJ's interpretation of the evidence here is reasonable and supported by the record.

### 4. Knee Pain

The record does not contain any evidence establishing that plaintiff has a medically determinable impairment due to her knee. The court has carefully examined the entire record and found only a single entry relating to plaintiff's knee: on November 29, 2007, plaintiff told QMHP Peterson that she would have surgery on her knee the following month. (Tr. 380). The entry does not identify the treating physician or describe plaintiff's medical diagnosis, thus it is impossible to tell why surgery was recommended or whether it was medically necessary.

Despite the lack of evidence, the ALJ included right knee arthrosis among plaintiff's severe impairments. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." Rollins v.

Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 416.929(c)(2)).  With the

exception of seasonal allergies, (Tr. 265), plaintiff's treatment records consistently identify

plaintiff as having no physical medical issues.  (Tr. 293, 401, 430).  And while plaintiff's

subjective complaints symptomatic of bipolar disorder are well documented, plaintiff's treatment

notes are entirely devoid of entries showing plaintiff complained of knee pain.  A claimant's

failure to report symptoms or limitations to treatment providers is a legitimate consideration in

determining the credibility of those complaints.  Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir.

2006).  The ALJ did not reject plaintiff's subjective pain complaints, rather, he discredited them

to the extent he found them to be inconsistent with and unsupported by the record.  The ALJ's

interpretation of the evidence here is reasonable and supported by the record.

### Conclusion

In reaching his determination with regard to plaintiff's credibility, the ALJ properly

evaluated her testimony and the record as a whole, and gave clear and convincing reasons

supported by substantial evidence for discrediting plaintiff's testimony.  Thus the ALJ's did not

err in discrediting plaintiff's testimony.

## III.  THE ALJ PROPERLY DISCOUNTED THE CREDIBILITY OF LAY WITNESSES

Plaintiff contends that the ALJ committed reversible error by failing to provide clear,

convincing, and germane reasons for discrediting the testimony of her lay witnesses.

### Standard

An ALJ must consider the testimony of friends and family members.  Smolen v. Chater,

80 F.3d 1273, 1288 (9th Cir. 1996).  To disregard such lay testimony violates 20 C.F.R. §§

404.1513(e)(2) and 416.913(e)(2).  See SSR 96-7p.  "Lay testimony as to a claimant's symptoms

is competent evidence that an ALJ must take into account, unless he or she expressly determines

to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).

An ALJ should generally "explain the weight accorded opinions from 'other sources' so that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-3p. However, there is no magical incantation that the ALJ must invoke in order to properly explain his or her reasoning. *See* Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989). A reviewing court may draw specific and legitimate inferences from discussions of the evidence, particularly where conflicting evidence is detailed and interpreted and findings are made, in order to assess why a statement or opinion has been rejected or accepted. Id.

### Discussion

The evidence presented by plaintiff's three lay witnesses is substantially identical. Plaintiff's mother, Tonna Clark, testified that plaintiff has a calcium buildup in her knee which developed when she was a child, and which now causes plaintiff substantial pain, such that she can walk at most one half block or do household chores for ten to fifteen minutes before needing to rest. (Tr. 48, 49). Ms. Clark testified plaintiff has problems dropping things, (Tr. 48), and has daily episodes of anger outbursts, crying spells, and anxiety attacks, is unable to complete simple household tasks because she cannot stay focused, and struggles with debilitating depression. (Tr. 50-52). Finally, Ms. Clark testified that she moved in with plaintiff and her husband during the summer of 2008 after plaintiff suffered a "nervous breakdown." (Tr. 53).

Plaintiff's daughter, Jaquonna Hareaway, testified that ever since she can remember plaintiff has struggled with daily anger outbursts, and still does. (Tr. 55). Ms. Hareaway

testified that plaintiff "zones out," has problems remembering things, and has debilitating crying spells and panic attacks. (Tr. 55-56). She testified plaintiff can walk approximately one block before stopping and drops things because her hands "get shaky," (Tr. 57), and that plaintiff has difficulty walking up stairs due to knee pain and finds ordinary housework challenging. (Tr. 58).

Plaintiff's husband, Michael Cole, testified that she no longer cooks, sleeps sporadically, can walk about one half block and do fifteen to twenty minutes of housework before needing to rest, and frequently drops things like plates of food and full glasses. (Tr. 60-62). He testified that plaintiff frequently lies to him about whether she has taken her medications, but that he "can always see signs of depression" when plaintiff does not take them. (Tr. 61). Mr. Cole testified that plaintiff has daily cycles of anger outbursts, crying spells, and panic attacks, usually closely associated. (Tr. 63-65).

The ALJ rejected the testimony of Ms. Clark, Ms. Hareaway, and Mr. Cole regarding plaintiff's knee pain and hand impairments for the same reasons he found plaintiff's testimony to be not credible: because the record is completely devoid of any evidence that plaintiff suffers from a hand impairment, and because plaintiff's activities of daily living and treatment record do not support the conclusion that plaintiff suffers from debilitating knee pain. With regard to the testimony about plaintiff's mood swings from anger, to crying and depression, to anxiety, the ALJ found the testimony of the lay witnesses to be inconsistent with plaintiff's treatment records, which reflect that these symptoms were responsive to treatment by medication and since late 2007 had been gradually and continuously improving. Mr. Cole's testimony that he can "always see" the effects when plaintiff stops taking or forgets to take her medications supports the ALJ's determination that plaintiff's symptoms are responsive to treatment and is consistent with the treatment records, which show a clear correlation between plaintiff's failure to take her

medications and her episodic setbacks. As described above, these are clear and convincing

reasons for discrediting plaintiff's own subjective complaints, thus it follows that these are

germane reasons for rejecting the testimony of plaintiff's lay witnesses as well. *See* Valentine v.

Comm'r Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009).

## VI. THE ALJ PROPERLY RELIED ON THE VOCATIONAL EXPERT'S TESTIMONY

Plaintiff argues that the hypothetical posed to the VE is invalid because it is based on an

improper RFC determination which fails to account for all of her functional limitations. Plaintiff

also argues that the VE failed to provide reliable information demonstrating that plaintiff is

capable of performing work that exists in "significant numbers" in the national economy.

### Standard

If a claimant shows that she cannot return to her previous work, the Commissioner must

show that the claimant can do other kinds of work. Magallanes, 881 F.2d at 756. The

Commissioner may carry this burden by eliciting the testimony of a vocational expert in response

to a hypothetical that sets out all the limitations and restrictions of the claimant. Id. "[A]n ALJ's

assessment of a claimant adequately captures restrictions related to concentration, persistence, or

pace where the assessment is consistent with restrictions identified in the medical testimony."

Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008). Although the hypothetical

may be based on evidence which is disputed, the assumptions in the hypothetical must be

supported by the record. Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).

### Discussion

#### 1.  The ALJ Properly Considered All Evidence In the Record

Plaintiff first argues that the ALJ's RFC determination is invalid because the ALJ failed

to consider all of the evidence presented, including the 2009 Questionnaire completed by

PMHNP Welch, plaintiff's subjective testimony, and the testimony of plaintiff's lay witnesses; because it disregards the cyclical nature of the symptoms associated with plaintiff's bipolar disorder diagnosis; and because it fails to account for the side effects of her prescription medications, specifically, drowsiness, dizziness, and uncontrollable shaking of her hands. As discussed in detail in the preceding sections, above, the ALJ properly considered the medical record and all other evidence presented in formulating plaintiff's RFC and that determination is supported by substantial evidence in the record.

### 2.    The Hypothetical Posed to the VE Incorporated Plaintiff's Limitations in Concentration, Persistence and Pace

Next, plaintiff argues that the ALJ failed translate plaintiff's limitations in concentration, persistence or pace into work-related functional restrictions when formulating plaintiff's RFC, therefore the hypothetical posed to the VE does not reflect all of plaintiff's limitations, rendering the VE's testimony invalid. (Pl.'s Opening Br., pp. 29; Pl.'s Reply Br., pp. 11-13).

At Steps 2 and 3 of the sequential analysis, the ALJ must evaluate the severity of a claimant's impairments to determine whether they meet or medically equal any of the impairments set forth in the Listings. 20 C.F.R. §§ 404.1520(d), 416.920(d). With respect to mental impairments, the ALJ must rate the degree of severity of a claimant's limitation in four broad functional areas: activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), (e)(2), & 416.920a(c)(3), (e)(2); *see* Keyser v. Comm'r Soc. Sec. Admin., No. 10-35371, -- F.3d --, --, 2011 WL 2138237, *2-3 (9th Cir. March 9, 2011). These functional areas are referred to as the "paragraph B" criteria in the Listings. 20 C.F.R. Pt. 404, Subpart P, Appendix 1, § 12.00C(1)-(4). If any of the claimant's impairments meets or medically equals a Listing, the claimant is presumptively deemed disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d). If none of the

claimant's impairments meet or medically equal a Listing, the ALJ must evaluate medical and

other relevant evidence in assessing the claimant's residual functional capacity ("RFC") before

proceeding to Steps 4 and 5 of the disability analysis. 20 C.F.R. §§ 404.1520(e), 416.920(e);

SSR 96-8p.

> At Step 3 of his determination, the ALJ recorded his findings as follows:

> "In activities of daily living, [plaintiff] has mild restriction. She functions independently cares for her granddaughter, and performs household tasks. *In social functioning, [plaintiff] has moderate difficulties.* She has a history of anger outbursts but reports stable mood with medication. *She reports anxiety in crowds. With regard to concentration, persistence or pace, [plaintiff] has moderate difficulties. She reports poor concentration during periods of anxiety but generally exhibits no concentration or attention deficits on mental status examination.* As for episodes of decompensation, [plaintiff] has experienced no episodes of decompensation which have been of extended duration. Because [plaintiff's] mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied. The undersigned has also considered whether the 'paragraph C' criteria are satisfied. In this case, the evidence fails to establish the presence of the 'paragraph C' criteria." [6]

(Tr. 13) (emphasis added). The ALJ explicitly noted that these findings "are not a residual

functional capacity assessment" and that formulating plaintiff's mental residual functional

capacity "requires a more detailed assessment by itemizing various functions contained in the

broad categories found in paragraph B," which he indicated was encompassed in his discussion

below in section 5 of his opinion. (Tr. 13).

---

[6] With respect to each mental disorder contained in the Listings, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00A states as follows: "Each listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). There are additional functional criteria (paragraph C criteria) in 12.02, 12.03, 12.04, and 12.06 ... We will assess the paragraph B criteria before we apply the paragraph C criteria. We will assess the paragraph C criteria only if we find that the paragraph B criteria are not satisfied. We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied."

The ALJ's RFC determination, in relevant part, restricted plaintiff to simple, repetitive tasks involving no interaction with the general public and only occasional interaction with supervisors and coworkers. (Tr. 13). This restriction directly addresses plaintiff's limitations due to concentration, persistence and pace which the ALJ found to be credible at Steps 2 and 3. Namely, the ALJ found that plaintiff's limitations due to concentration, persistence or pace are anxiety induced, and her anxiety is, in turn, triggered by being in a crowd, therefore, the ALJ accommodated plaintiff's limitations by restricting her to positions which do not involve being in a crowd. The ALJ found this restriction to be consistent with the medical record and the opinion of the agency's consulting psychologist, Dr. Anderson. (Tr. 17). Dr. Anderson completed both a Psychiatric Review Technique, (Tr. 310-323), and a Mental Residual Functional Capacity Analysis ("MRFCA"), (Tr. 324-327) as part of her review of plaintiff's social security benefits application. On the MRFCA, Dr. Anderson found that plaintiff was "moderately limited" in only four of twenty areas: the ability to carry out detailed instructions, the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to be aware of normal hazards and take appropriate precautions. (Tr. 324-325). Of these, only one falls within the category of "Sustained Concentration and Persistence": the ability to carry out detailed instructions. (Tr. 324). Notably, Dr. Anderson found that plaintiff had no limitations in the ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; or complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 324-325).

Plaintiff appears to argue that the cyclical nature of her symptoms precludes competitive employment because even if her condition improves, thus enabling her to obtain employment, the improvement is necessarily temporary and she will inevitably relapse into a state of debilitating anxiety during which she is unable to sustain concentration on even the simple, repetitive work which the ALJ found her capable of performing. However, as discussed above the ALJ expressly found plaintiff's allegations of debilitating anxiety to be inconsistent with the medical record and with plaintiff's ADLs. As discussed in detail above, the ALJ's determination that prescription medication successfully treated plaintiff's symptoms and that plaintiff was able to sustain a stable mood for prolonged periods of time following a final adjustment to her medications in February 2008, provided that she took her medications as prescribed, is a reasonable interpretation of the evidence and supported by the record.

For the reasons stated above, the court finds that the ALJ's determination with regard to which of plaintiff's limitations in concentration, persistence, and pace are credible is supported by substantial evidence in the record, and that the ALJ's translated all these limitations into functional restrictions in his RFC determination. The hypothetical posed to the VE thus reflects all of plaintiff's functional restrictions, and the testimony elicited in response to the hypothetical is valid.

### 3.   The ALJ Properly Relied on the VE's Testimony

Last, plaintiff argues that the VE's testimony regarding the number of jobs available in the national economy which plaintiff can perform is unreliable. The VE identified two jobs plaintiff would be capable of performing:  small products assembler and small products cleaner and polisher. (Tr. 67-68). The VE identified these positions in response to a hypothetical from the ALJ limiting plaintiff to lifting 20 pounds occasionally and 10 pounds frequently, standing

and walking two hours a day, sitting six hours a day, limited to simple repetitive tasks, with no interaction with the general public and only occasional interaction with supervisors and co-workers. (Id.). The VE testified that for small products assembler there were 1,200 jobs regionally and 84,000 jobs nationally, and for small products cleaner and polisher there were 800 jobs regionally and 56,000 jobs nationally. (Id.). The ALJ's decision noted that, pursuant to SSR 00-4p, the VE's testimony was consistent with the information contained in the DOT. (Tr. 18). Plaintiff argues that the VE's testimony is unreliable because she failed to identify the specific number of jobs available for each Dictionary of Occupational Titles ("DOT") code identified as a job that plaintiff could perform.

Plaintiff fails to identify a basis for finding the VE's testimony unreliable. Social Security regulations "recognize vocational experts and several published sources other than the DOT as authoritative." Johnson v. Shalala, 60 F.3d 1428, 1435-36 (9th Cir. 1995) (citing 20 C.F.R. § 404.1566(d)). However, the ALJ must resolve conflicts between the DOT and a VE's testimony. SSR 00-4p; Massachi v. Astrue, 486 F.3d 1149, 1152-54 (9th Cir. 2007). "Evidence sufficient to permit such a deviation may be either specific findings of fact regarding the claimant's residual functionality, or inferences drawn from the context of the expert's testimony." Light v. Soc. Sec. Admin., 119 F.3d 789, 794 (9th Cir. 1997) (internal citations omitted). Here, the VE testified that she used Skill Trend by Job Browser to identify the jobs which plaintiff was capable of performing. (Tr. 72). Skill Trend reports job numbers using O*Net SOC codes. (Id.). O*Net has replaced the DOT, which was last updated in 1991.[7] At the request of the ALJ and plaintiff's counsel, the VE identified several "representative DOT codes

---

[7] See generally http://www.oalj.dol.gov/LIBDOT.htm ("The DOT has been replaced by the O*Net[:] The DOT was created by the Employment and Training Administration, and was last updated in 1991. It is included on the Office of Administrative law Judges (OALJ) web site because it is a standard reference in several types of cases adjudicated by the OALJ, especially in older labor-related immigration cases.")

in the cluster group" for the O*Net SOC small products cleaner and polisher occupation (e.g., 590.685-102 for wafers, 715.684-170 for clock parts, 715.687-126 for watch parts, 716.687-010 for optical goods, and 729.687-014 for electrical equipment,). (Tr. 68). Here, the ALJ satisfied his responsibility to inquire into any inconsistency by requiring the VE to inform him if her testimony varied from the DOT, and the plaintiff does not demonstrate any conflict between the VE's testimony and the DOT. On this record, the reliance by the ALJ on the VE's testimony was proper.

## RECOMMENDATION

Based on the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision that plaintiff did not prove disability and is not entitled to disability insurance benefits or supplemental security income under Titles II and XVI, respectively, of the Social Security Act is based on correct legal standards and supported by substantial evidence. It is recommended that the Commissioner's decision be AFFIRMED and this case be dismissed.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. *Objections to this Report and Recommendation, if any, are due by June 27, 2011. If objections are filed, any response to the objections is due by July 15, 2011. See* Fed. R. Civ. P. 72, 6.

DATED this _____ day of June, 2011.

_____
MARK D. CLARKE
United States Magistrate Judge